# WESTMORELAND COUNTY.

## June Term, 1794.

### Leſſee of SAMUEL DIXON *v.* SAMUEL MOREHEAD.

AT the trial of an ejeɛtment for 317 acres of land, in *Armſtrong* townſhip, the plaintiff produced an application, No. 588, dated 3d *April*, 1769, in name of *David MᶜCrory*, for 300 acres, on a run emptying into *Blacklick* creek, five or ſix miles above the *Blacklick*, on the weſt ſide of ſaid creek ; and a ſurvey of 317 acres, made 22d *April*, 1773, deſcribed as in the location ; and a conveyance of the ſame land, in fee-ſimple, from *David MᶜCrory* to *Samuel Dixon*, dated 3d *July*, 1772.

The defendant ſhewed a warrant, dated 24th *January*, 1785, in name of *Samuel Morehead*, the younger, for 300 acres of land, including his improvement, on *Twolick* creek, and the mouth of *Stoney* run, adjoining land of *John Pumroy*, in *Armſtrong* townſhip, *Weſtmoreland* county, charging intereſt from 1ſt *March*, 1771; and a ſurvey of 295½ acres made on this warrant. He ſhewed alſo an ejeɛtment brought by him, in this county court, for this land, againſt the preſent plaintiff, of *January* term, 1774; and a verdiɛt and judgment for him, of *Oɛtober* term, 1785. But this verdiɛt ſeemed to have been without any examination of *Dixon's* title ; and it ſeemed alſo to have been in his abſence. *Morehead* now

also shewed a written award in his favour, by four of
five arbitrators, to whom, or a majority of them, there
was a submission by the parties of their dispute respect-
ing this land. The opinion of the fifth arbitrator was
in favour of *Dixon*. This award was made in the pre-
sence of both parties, and after examination of their evi-
dence of title.

1794.

The survey made on *M'Crory's* application corres-
ponded to the description. The creek, in 1769, and for
about four years afterwards, was called *Blacklick*; but,
from that time, it was called *Twolick*. In *July* or *Au-
gust*, 1773, *Dixon* had built a cabbin on this land. In
*December*, 1772, *Morehead* went to *improve* on this land,
with a view to hold it, and to build a mill, on a mill-seat,
at the mouth of the run; built a cabbin, but did not
cover it. And, in *May*, 1773, he plowed ground for a
garden, and planted potatoes. This was close by where
*Dixon* afterwards built his cabbin. In the fall of 1773,
*Morehead* lived with his family in *Dixon's* cabbin. In
1774, or 1775, *Morehead* had a field cleared, and built
a mill, which was going in 1775, and was burnt by the
*Indians* in 1778; since which time, the land has been
vacant. The cabbin built by *Morehead*, in *December*,
1772, was 248 perches from *Dixon's* cabbin, was not in-
cluded in *Dixon's* survey, and had good land all round it.

*Brackenridge*, for the defendant, rested chiefly on the
settlement made by *Morehead*, and on the award in his
favour.

*Woods*, for the plaintiff, referred to the act for open-
ing the Land-Office in 1784, and to the preamble to the
opening of the Land-Office in 1769, and contended that
improvements, since the purchase of 1768, gave no title,
and that no title could be obtained till 1784.

PRESIDENT. The act of assembly of 1786, continued
by subsequent laws, *now* protects settlements or farms
against any adverse title by warrant. Even before this
law, it had been considered, in the general opinion of this
country, that, by *general usage*, and a kind of *common law*,
they were protected. Some decisions, since the last war,
contradicting this general opinion, usage, or common
law, the act of 1786 was thought necessary. And sub-
sequent decisions have re-established the same principles,
even with respect to titles previous to the act. But,

30th Decem-
ber.

both under that act, and the late decisions, it is an *actual settlement* or *farm*, that is protected, not a mere *improvement*, as it is called. The same idea is held out, in the preamble to opening the Land-Office, on 3d *April*, 1769, and in the 8th and 9th sections of the act of 3d *April*, 1792, for the sale of vacant lands within this Commonwealth. So that from the 3d *April*, 1769, to the 3d *April*, 1792, and to the last decisions of the judges; it appears to have been the prevailing and recognized opinion of legislators, judges, and proprietors, that no warrant or paper title is valid, as against a prior *actual settlement* or *farm*. But no act of the proprietors, no law or decision, has ever yet said, that what is called an *improvement* is protected.

The paper title of the plaintiff was clearly appropriated to this land, on the 22d *April*, 1773, by a survey of land corresponding to the description of the application. At that time, nothing on the part of the defendant, appeared on the land tending to a *settlement*, but a cabbin, built in *December*, 1772, unfinished, uncovered, and not included in the plaintiff's survey. This surely will not amount to what legislators, judges, or proprietors, have called an *actual settlement*. It amounts only to what is called an *improvement*, and what none have protected.

No attempt, to convert this improvement into an actual settlement, is made by *Morehead*, till *May*, 1773, after *Dixon* had, by his survey, appropriated this land to himself. Then, and knowing of this survey, he plows a small piece of ground, and plants potatoes in it. Soon after, in *July* or *August*, 1773, *Dixon* builds a cabbin, into which *Morehead* afterwards enters, lives in it in 1774, with his family. In 1775, he builds a mill.

If there had been a settlement by *Morehead*, at the time of *Dixon's* survey, leaving it out of the survey would not be sufficient. I should think the settler intitled to the usual quantity of land, contiguous to his settlement, and within his claim, though included in the adverse survey.

I have considered the plaintiff's title as attaching to this land, only at the time of his survey, on 22d *April*, 1773; because his location is not precisely definite; and because it is not necessary to carry it farther back, since

the defendant's actual fettlement does not feem to have exifted till in 1774.

My idea'is, that if a man makes a *fettlement* or *farm*, on land before a paper title is attached to it; he ought to be protected. But if he make only what is called an *improvement*, he may as well lofe this, as his adverfary lofe his office or paper title. If a paper title ought to yield to a *fettlement, an improvement* ought to yield to a paper title.

It is pity, that any land fhould be confidered as fold or appropriated, before it is furveyed.

One verdict in ejectment is not conclufive ; and the former trial between thefe parties, feems to have been without any difclofure of the merits. A verdict in ejectment intitles only to poffeffion, and does not determine the right.

The principal difficulty in this cafe feems to be in the award. In what light are we to confider it ? If we confider it as an agreement of the parties, and apply to it the rule in equity, that what ought to be done is confidered as done, it would operate as a title againft the plaintiff. If we confider it only as a verdict in ejectment, it is no bar to a further profecution of the title : and, as to title, the *Englifh* law fays, an award is not conclufive. I am therefore, difpofed to think, that it fhould have no greater force, than a verdict and judgment in ejectment.

*1 Bac. abr. 132,133 140. 3 Comm. 16.*

The jury found a verdict for the plaintiff.

On the motion of Mr. *Brackenridge*, there was a rule to fhew caufe why this verdict fhould not be fet afide, and a new trial granted.

At *September* term, 1795, the motion for the new trial was argued.

*Brackenridge*, for the new trial. The fubmiffion and award concluded the parties ; and fo the court ought to have directed the jury : whereas the court ftated, that it fhould have but the effect of a verdict in ejectment.—— Award on fubmiffion amounts to a contract with fufficient confideration. And a confideration need not be expreffed, if it be implied in the tranfaction. I confider the cafe of *Penn v.* lord *Baltimore* as decifive of the prefent cafe ; for if the court of Chancery carry an award into execution, a jury will.

*1 Powel Contr. 330, 342, 344, 368. 2 Powel Contr. 7-10.*

The diſtinction between awards of real property, and of perſonal, ariſing only from feudal principles, exiſts not in *Pennſylvania*; and even in *England*, is reduced to a mere point of form. Improvement-rights to land paſs by parole, like chattels. Whether it be a real or a perſonal eſtate, therefore, in *Pennſylvania*, an award of land is good.

The end of a reference is to ſettle amicably what cannot be ſo well ſettled in a court. It entirely defeats this end to give an award no greater effect than a verdict. It is the general opinion, that awards are final, and the general intereſt, that they ſhould be ſo. The people know no diſtinction between awards of real and of perſonal property : and we ought to take their contracts as they underſtand them ; eſpecially as this is for their benefit.

Taking it either as an award or as a contract, the jury ought to have been directed to conſider it as equivalent to a deed of the party under hand and ſeal.

*Roſs*, againſt the new trial. The point in *Blackſtone* is not, that an award is not final, but that an award will not paſs real eſtate. There is good reaſon why an award of perſonal eſtate ſhould be final, becauſe a verdict is final. But the whole analogy of the law is, that a verdict, though in a writ of right it is, in an action for the poſſeſſion of land is not final. Why then ſhould an award be final ?

Execution goes out on a report of referees, as on a verdict, except where, as here, a ſpecific thing is awarded. Had this been a reference by rule of court, in ejectment, it would only have given the poſſeſſion, and could not have prevented another ejectment.

Unpatented lands, held by location, warrant, or ſurvey, are always conſidered as real eſtate. Dower will lie of them ; yet the plea is ſeizin or not. This is a caſe of land held by location and ſurvey.

The caſe of *Penn v.* lord *Baltimore* proves, that an award is not final, for there was a neceſſity to file a bill for a ſpecific performance. Why this, if an award be a conveyance ?

Our act of aſſembly makes an award but as a verdict. However this is not an award : for the ſubmiſſion was to five ; and the award ſtates, that there was one diſſentient voice. The award is on a parole ſubmiſſion to

five, was affented to only by four, and ought not to have 1794.
been read to the jury. Had it been perfect, it could
have no other effect than a verdict.

In *McKee* affignee of *Berrickman v. McClure,* tried *March Term,*
in the court of Common Pleas of *Allegheny* county, the 1792.
prefident confidered an award as not final, and left it to
the jury, who found againft it. In *Estep v. Wallace,* at
a court of Nifi Prius in *Washington* county, the chief *May. 1792.*
juftice left an award to the jury, who found againft it. *M Kean C. J.*
*and Yates J.*
In *Howard v. Pollock,* at Nifi Prius, in *Washington* *May, 1795.*
county, an award, on an arbitration bond of fubmiffion *M Kean C. J.*
to five, figned only by three, was not fuffered to be read *and Yates J.*
to the jury.

We have certificates of two of the referees or arbi-
trators, that their intention was, that the award fhould
have no other effect, than a verdict in ejectment; that,
before they gave their award, it was propofed by one of
the referees, that the parties fhould be bound to ftand to
it; and they objected to this, and it feemed to be drop-
ped.

*Brackenridge* in reply. The court of Chancery only
eftablifhed the evidence of *William Penn's* title. That
cafe is altogether with me. Chancery will decree a con-
veyance on any act *en pais,* which will be a ground of
it, confidering that as tantamount to livery and feizin.

Our act of affembly is in imitation of the act of par- *1 St. L.*
liament 9 and 10 *William* 3, and meant the fame thing *3 Comm. 17.*
and no more. A report or award is only examinable,
as to corruption or mifbehaviour of arbitrators or parties.

The general underftanding of fubmiffions is that the
award of a majority is fufficient. The choice of an odd
number is to prevent the embarraffment arifing from an
equal divifion, and fecure an end of the controverfy.—
There was evidence that the fubmiffion was to five, or
a majority of them.

It would have been foolifh to have inferted in the
award, that it fhould be final; and this propofal was ju-
dicioufly rejected. The arbitrators were only to make
an award, not to declare its validity or effect. It is im-
material what they thought as to this. The parties
meant it to be final. The law makes it fo.

At *December* term, 1795, the opinion of the court
was delivered.

1794.

PRESIDENT. In the trial of this ejectment, at *June* term, 1794, the defendant gave evidence, that he and the plaintiff, had, before the commencement of the action, submitted their dispute, about the right of the land in question, to five arbitrators or a majority of them; and that four of the five had awarded in favour of him, the fifth only being in favour of the plaintiff's title.— In the direction to the jury, I told them, that, considering this award as giving the right, it could not have this effect, for, by the law of *England*, title to real estate cannot be transferred by award; and, considering it as giving the possession, it was not decisive, for one judgment in ejectment is no bar to another ejectment for the same land.

A verdict having been given for the plaintiff, a motion has been made, to set it aside, on the ground, that the jury ought to have been directed to consider the award as decisive of the right of these parties to this land.

Disputes about property may be terminated, and the right transferred from one of the contending parties to the other, by consent, by compulsion, or by a combination of both. It is by consent, when one agrees to give, and the other to accept, something else, in lieu of the property in dispute. It is by compulsion, when one obtains process and sentence of a competent court of justice against the other. And it seems to be a combination of both, when, unable to settle the dispute themselves, they refer it to others, to whose opinion they bind themselves to submit. Whichever of these methods be adopted, whether contract, judgment, or award, the dispute is thereby settled, and the right ascertained.

1 *Powel Contr.* 318-9,
1 *Bac. abr.* 132
-4. 1 *At.* 64.
1 *Comm.* 16.
4 *Vesey, jr.* 365-70.
1 *Com. Dig.* 301, 2 *Eq. Ca.* 80. *Vinior's Ca.* 8 *Co.* 80.
1 *Salk.* 69, 76.
2 *L. Ray* 1840
*Woods' Inst.* 548-51.
*Lofft.* 426.
3 *Comm.* 16.

An award is sometimes considered as a contract, sometimes as a judgment. And arbitrators are sometimes considered as the substitutes, and sometimes as the judges of the parties. They can do whatever the parties themselves can do, and more than courts can do. Their power is revocable, as a power of attorney; and, if not given by deed, no action lies for its revocation; for, as *ex nudo pacto*, so *ex nuda submissione, non oritur actio*.— The submission implies mutual promises to perform the award. The award is a contract, and is considered as similar to accord and satisfaction, and equal to the judgment of a court.

It is true, that the Supreme court of *Pennſylvania* has confidered an award, as on a footing with a verdict, and equally under their control. But other decifions in this ſtate, and the rules of the *Roman* and *Engliſh* law, viewing arbitrators as both judges and jury, have treated awards with higher refpect. The courts, both of equity and law, have conftantly refufed to enter into the merits of the matter referred, or examine the juftice and reafonablenefs of the award; and have declared, that, the arbitrators being judges chofen by the parties themfelves, they cannot object to the award, as unreafonable, or as a judgment againft law: for they have referred their difpute to the judgment of the arbitrators, and that would be a ground for fetting afide every award. Lord *Hardwicke* doubts whether an award, like a decree, can be fet afide, on the difcovery of new evidence. And in a cafe in Chancery, of an account, which, after many errors had been affigned, and allowed by the mafter, having been referred to arbitrators, was reported a juft account; lord *Thurlow*, though he expreffed great furprife at the report, and fpoke very hardly of it, added, that " the parties, by choofing private judges, have placed it beyond the reach of any principle of law."—— But though, when the parties themfelves choofe their own judges, chancery will not generally relieve againft the award; yet, where there is a reference, by order of that court, and the award appears unequitable, it will not be decreed. And, when the reference is to an arbitrator, to enquire into facts, he is in character of a mafter in Chancery, or a jury in a trial at common law; and the court is to draw the conclufion; or, if he does it, the court will fee that he has drawn a right conclufion. And there are alfo many cafes, in which though the fubmiffion be general, and to arbitrators chofen by the parties, yet courts will hold the award as void. The grounds on which they will do this, appeat either in the award itfelf, or in the parties, or in the arbitrators :*

1794.

*Williams vs. Craig, Dall.* 313. *Hollingſworth v. Leiper, ib.*16. *Vinn. Juſt. Inſt.*612,710. *Woods' Inſt. Civ. law* 389. *Anderſon vs. Coxeter,*1*Str.* 301. *Lucas v. Wilſon,* 2 *Burr.* 701. *Herbert vs. Buckley. Ridgeway's ca. temp. L. Hardw.* 296. 1 *Atk.* 64. 3*Atk.* 529. *Veſey jr.*370. *Ridgeway's ca. temp. Ld. Hardw.*299. *Price v. Williams. Veſey, jr.* 365.

1*Eq. Ca.* 50.

*Veſey jr.*370.

1*Bac. abr.*134 -5, 144-7. 1 *Com. Dig.* 3·9, 1*Eq.Ca.* 50.1. 2 *Eq. Ca.* 80-1.

* In an action at law on an award, evidence of partiality or corruption in the arbitrators was refufed, as affecting third perfons, and as out of the award and the iffue. The remedy for this was ftated to be by action againft the arbitrators, or by bill in equity to fet afide the award, where the arbitrators may be made parties, and may be made pay cofts. 2 *Wils.* 148—2 *Atk.* 396—2 *Veſey,* 316.

as if the award be not final, or mutual, or be uncertain, abfurd, impoffible, or unlawful; or be erroneous on the face of it; or if either of the parties, or rather, perhaps, if the party in whofe favour the award is, has procured it by undue means, by fraud, or impofition on the arbitrators or the other party; or where the arbitrators mifbehave themfelves, are partial, interefted, or corrupt, or proceed irregularly, or on a plain and grofs miftake, either in law or in fact. " But," fays lord *Thurlow,* " in cafe of miftake, it muft be made out to the fatisfaction of the arbitrator; and the party muft convince him, that his judgment was influenced by that miftake, and that, if it had not happened, he fhould have made a different award."

Such feems to be the law of *England,* and, excepting the decifion of the Supreme court already fuggefted, the law of *Pennfylvania,* refpecting the effect of awards.— Under the regulations, which I have ftated, awards feem generally to have been confidered as a kind of judgments, given by private courts, conftituted by the parties, and equally binding as a contract of the parties, or a judgment of a court of competent jurifdiction. Whether our act of affembly, by directing, that reports in references of caufes depending, *being approved by the court, fhould have the effect of verdicts,* meant to make fuch reports liable to other exceptions, than thofe allowed in *England,* reduce them to a footing with verdicts, and fubject them to the fame exceptions as verdicts are fubject to; or meant only to fubmit them to the fame exceptions, as may be made to fuch reports in *England,* and to give, to a judgment on a report, the ordinary procefs after judgment on a verdict, inftead of the procefs of attachment ufed in *England,* was, before that decifion in the Supreme court, I believe doubtful.

I have hitherto had no occafion to ftate particularly the feveral kinds of awards, which exift in *England;*— becaufe I think the effect of each is the fame, and their difference is in the remedies, or means of execution. I fhall now however obferve, that, in that country, there are three kinds of awards, two at common law, and one by ftatute.

1. At common law, the parties differing, may agree, either by word, or by writing fealed or unfealed, to fub-

*Margin citations:*

1794.

1 Salk. 71-3.
1 Atk. 64.
3 Comm. 17.
Lofft. 554.
3 Atk. 644.
2 Vefey 315.
Ridgeway's
ca. temp. Ld.
Hardw. 296.
Vefey. jr. 370.

3 Comm. 16.

1 St. L.

Lucas v.
Wilfon.
2 Burr. 701.

mit their difpute to arbitrators, without inftituting any 1794. fuit, and the award of the arbitrators binds the parties. If it be not obeyed by either party, the other has his remedy, by an action at law, either on the fubmiffion, or on the award.

2. Where the parties have inftituted a fuit, either at law or in equity, they may agree to withdraw the exam- ination of it from the jury or the court, and fubmit it to arbitrators, making this fubmiffion a rule of the court, where the caufe is depending. The award, when made, is brought into the court, and, on the complaint of either party, if it has been improperly made, the court fet it afide, or, if no impropriety appear, compel obedience to it, by procefs of attachment; difobedience being a con- tempt of the rule made by the court.

3. From the experience of the ufe of thefe peaceable and domeftic tribunals, a ftatute enacted, that parties in any cafe, where the remedy is by perfonal action, or fuit in equity, may, without any fuch action or fuit, fubmit their difference to arbitration, and agree that fuch fub- miffion be made a rule of any court of record, and this fubmiffion, having been made a rule of one of the courts, and the arbitrators having made their award, it is re- turned into the court of which the fubmiffion was made a rule, and, by that court, on the complaint of either party, within a limited time, annulled; or it is enforced, in the fame manner as an award in a cafe where a caufe was depending at the time of the fubmiffion. For this ftatute is only declaratory of what the common law was before, in cafes where there was a caufe depending, and was made to put fubmiffions, where there was no caufe depending, on the fame foot as thofe, where there was a caufe depending.

3 *Comm.* 17, 9, 10, *W.* 3, *c.* 15.

2 *Burr.* 701.

4. Our act of affembly, in cafes of mutual accounts, did not copy this *Englifh* ftatute, but introduced into *Pennfylvania* a fourth fpecies of awards, which differs from the fecond fpecies before mentioned, in this, that the report, when approved by the court, is to be pro- ceeded on, as a verdict, by judgment, and then by exe- cution or *fcire facias*, as the cafe may be, not by attach- ment; and according to the decifion of the Supreme court, in this alfo, that it is open to the exceptions which may be made to a verdict.

1 *St. L.*

2

1794.

Together with this, the firſt and ſecond kinds of a-wards muſt be conſidered as exiſting here, in full force; and theſe only: for the third ſpecies has never been introduced here.

*Williams v.*
*Craig,*
*Dall.* 313.

With reſpect to the deciſion of the Supreme court, it will be ſufficient to obſerve, that this award is not of the ſame kind with that, on which that deciſion was made. That was of the fourth kind, under our act of aſſembly, on a reference of a cauſe then depending in court. The award, in the caſe before us, is of the firſt kind, at common law, and not under our act of aſſembly.

It was ſtated to the jury at the trial, and it muſt be repeated now, that though there have been awards in ejectment, and of leaſes, the poſſeſſion only, a ſort of chattel intereſt being in queſtion, and though if a conveyance of an eſtate in fee-ſimple be awarded, its refuſal is a breach of the arbitration bond; yet, a judgment in ejectment being no bar to another ejectment, and, by the law of *England,* an award being inſufficient to transfer the right to real eſtate; the award was not concluſive in this action. This, which was the principal difficulty at the trial, is the point now to be diſcuſſed. It has come before us in a ſhape, in which I have not obſerved it before, in any court; and, however unfurniſhed with guides and precedents, we muſt now examine and decide it.

Conſidering it as a principle of *Engliſh* law, that an award cannot transfer title to real eſtate, I do not ſee how, when an award was given as evidence of title to real eſtate, conſiſtently with that principle, any other direction could be given to the jury.

*3 Comm.* 16.

The argument of the defendant's counſel encountered this difficulty, by urging, that the reaſon for refuſing to awards a binding force on real titles, having originated from feudal principles, to prevent colluſive alienations, without the conſent of the lord, does not exiſt in *Pennſylvania;* and, therefore, the diſtinction between awards of real and of perſonal property, will not be kept up.— That, even in *England,* this was reduced to a mere ſubtilty in point of form, and was eaſily evaded, by awarding a conveyance, which, if refuſed, can be compelled, by exacting the penalty of the arbitration bond; for, the refuſal being a breach of the award, the penalty can

be faved only by compliance. That an award was equi- 1794.
valent to an agreement ; and that improvement titles,
inchoate or imperfect titles, to land, were transferred
by parole, like chattels. That the cafe of *Penn v.* lord
*Baltimore,* is in point for the defendant here. And that
any fufficient act *en pais* will, in Chancery be confidered
as equivalent to livery and feifin, and ground a decree
of conveyance. Thus, whether as a contract or an award,
the evidence was, in *Pennfylvania,* conclufive againft
the title of the plaintiff.

1. This argument gives up the defendant's cafe, if
the *Englifh* common law principles of awards of real
property are binding here.

2. By relying on the cafe of *Penn v.* lord *Baltimore,*
and the practice of the court of Chancery, it feems not
to be wifhed, that we fhould go farther than the court
of Chancery has gone, in like cafes.

3. Or fome other principles muft be eftablifhed, con-
formable to the ftate of real titles in *Pennfylvania.*

1. As to the firft, I repeat, that I cannot yet fee how,
on the principles of the common law of *England,* taking
them as ftated, the direction to the jury could have been
otherwife than it was. But this fubject will recur un-
der the laft head.

2. I am dipofed, in all poffible and proper cafes, to
adopt the rules of decifion in the court of Chancery ;
and, in this cafe, to go as far, as any court of Chancery
has ever gone. Courts of Chancery have, in many in- *Scott v Wray*
ftances, decreed fpecific performance of an award of title 1 *Rep. Cha.*
to real eftate. But it muft be obferved, that, in all cafes, 84. *Bales v.*
where they have done this, there has been an affent to 144. *Evans v.*
the award, by the perfon againft whom the decree was *Cogan,*
prayed, or an acceptance by him of fomething under it, 2 *Wms.* 450,
which is evidence of affent, or, with his connivance, or *dy,* 3 *Wms.*
at his requeft, a performance, or part performance, of it, 187. 1 *Eq. Ca.*
by the other party. And lord *Hardwicke* exprefsly de- 51. 2 *Eq. Ca.*
clares, that a bill, to carry an award into execution, *Thomfon v.*
where there is no acquiefcence in it by the parties, or *Noel.*
agreement by them, afterwards, to have it executed, 1 *Atk.* 62.
would certainly not lie. Confidering that an award is 1 *Powel Con-*
as a contract, and that equity decrees a fpecific perform- *tr.* 318-9.
ance of contracts, the beft reafon that I can fee for the

Q 2

1794.    court of Chancery diftinguifhing between a contract made by the parties themfelves, and an award made by their fubftitutes, is this, that in contracts, the parties know the terms and extent of their engagement, when they enter into it; and it is, therefore, againft confcience to refufe compliance. But, in awards, they know not the terms and extent of their engagement, which depend on the judgment of the arbitrators, and, as it may turn out harder, than the party intended, Chancery may refufe to make performance a point of confcience, and leave the perfon who complains of non-compliance, to his remedy at law.

1 *Vefey* 444.    The cafe of *Penn v.* lord *Baltimore* is not in point, or, at leaft, not conclufive. It is not the cafe of an award, *ib.* 445.    but of an agreement in writing. One of the objections to the decree prayed for, in that cafe, was, that the articles were in the nature of fubmiffion to arbitration, which cannot be fupplied by interpofition and act of the *ib.* 450.    court of Chancery. But faid lord *Hardwicke,* " the articles are not like fubmiffion to arbitration ; for, in thofe cafes generally, the time is conditional, fo as determination be made by fuch a day : but here the line and circle are agreed on. This is a particular, certain, fpecific contract of the parties ; nothing left to the *judgment* of the commiffioners, who are merely *minifterial,* to run the line, &c. according to the agreement."

3. If the argument for the defendant be not fupported, on the rules, either of the common law, or of equity, it remains therefore to be confidered, whether it can be fupported on fome other principles, conformable to the ftate of real titles in *Pennfylvania.*

If the diftinction between awards of real and of perfonal property refted only on feudal principles, perhaps the maxim *ceffante ratione, ceffat et lex,* and a principle, which I think good, that we take not fuch parts of the common law of *England,* as are incongruous to our circumftances, might be a fufficient anfwer to it.

1 *L. Ray* 115.    But another ground is given for this diftinction, to wit, that things in the realty cannot be recovered on an award. For, though arbitrators are in the room of parties, and act in their ftead, and can do what they can do, 1 *Bac. abr.* 132 they can do no more ; therefore an award cannot pafs corporeal inheritance, for the parties themfelves cannot

paſs that, without ſolemn livery. Yet this reaſon, comparing it to the authority of the parties, ſeems to admit, in ſubſtance, the authority of the arbitrators, over real eſtate, and to reduce the diſtinction, as *Blackſtone* ſays, to a mere form, by an alteration of which, the ſubſtance may be effected. For doubtleſs an arbitrator may award a conveyance or a releaſe of land ; and it will be a breach of the arbitration bond, to refuſe compliance. In ſtrictneſs, therefore, the rule of the *Engliſh* law may amount only to this, that an award, of itſelf, does not operate as a conveyance of the land. And this perhaps is what chief juſtice *Treby* meant, when he ſaid, "that things in the realty might be ſubmitted, as well as things in the perſonalty ; but they could not be recovered on the award."

*1794.*

*3 Comm.* 16.
*Huuter v.*
*Benniſon,*
*Hardr.* 43.

*1 L. Ray* 115.

This, therefore, brings us to the conſideration of what intereſt the parties had, at the time of the award ; and whether it be neceſſary that the award ſhould operate as a conveyance.

It is contended by the counſel for the defendant, that improvement rights paſs by parole, like chattels. I ſhould be unwilling to recogniſe this generally. It might affect creditors. It might lead to a concluſion, that ſuch rights are not bound by a judgment, and might be ſold on execution as chattels ; or that a ſubſequent ſale, with delivery of poſſeſſion, might defeat a *bona fide* prior ſale by deed. I am not prepared to ſay, that this is law. I do not believe, that it is the received opinion. I think the practice of lawyers and others is contrary to this.

At the time of this award, *Morehead* was in poſſeſſion of the land. By *Dixon's* two ejectments againſt him, his poſſeſſion is admitted. He wanted nothing but title ; and that was in the ſtate. *Dixon* could have deceived no man, on the credit of this land ; and one ground for requiring ſolemnity of conveyance exiſts not here. Without determining, therefore, whether an improvement or location right be a real or a chattel intereſt, or whether any others than the parties would be bound by an award of it, let us ſee, whether, in this caſe, too little ſtreſs was not laid on the award in the direction to the jury.

The award is in *June*, 1791. *Dixon*, in virtue of his location, has a ſurvey made in *April*, 1773. *More-*

2 3

*head* has a warrant in *January*, 1785. Both therefore, at the time of the award, had a claim on the ftate for a title. To fettle the point between them, to whom the ftate fhould give the preference, they might enter into an agreement, and, though this were by parole, I think, the executive agents of the ftate, and the courts of juftice,* would hold it conclufive on them, or, at leaft, on the party out of poffeffion; or they might fubmit their difference to arbitration, and, I think, the executive agents of the ftate, and the courts of juftice ought to hold the award conclufive on them, or, at leaft, on the party out of poffeffion. They have chofen their judges; judges tied down to no ftrict or formal rules in reftraint of juftice; but vefted with ample powers for the moft equitable redrefs to both parties. The authority of a tribunal of this kind ought not to be lightly impugned, nor its fentence eafily evaded. If the jury had been directed to confider the award as conclufive, it would not have been fo much a decree of a fpecific performance of an award, as making it a bar to a further profecution of the claim fubmitted. It would not have been an *interference*, but a *refufal*, to change the ftate of things, and faying, they fhould remain as they were.

I think, therefore, that, in the direction to the jury, fufficient weight was not given to the award in this cafe; and, therefore, that there ought to be a new trial.— When I fay fo, I, at the fame time, declare, that I do it with fome anxiety; and I wifh, for the fettling of fo important a point, that the next time this queftion is difcuffed, it may be before judges, whofe opinion will give more weight to the decifion, than any judgment, that I can form.

It will be obferved, that we do not take into view any opinion which the arbitrators may have entertained of the legal effect of their award. They were to give their judgment on the cafe fubmitted. The operation or effect of their judgment is to be dictated by the law.

---

* Where a fuit is depending for the title of land, the Board of Property will not iffue a patent for it, till the fuit is determined; and will then give a patent to the fuccefsful party.

It will also be obferved, that, though our opinion refts on all the circumftances of this cafe; yet, as in all cafes, a fubmiffion and award is a folemn tranfaction, and ought to mean fomething; perhaps lefs than we have done would be making it mean nothing at all. The effect of an ejectment is known and fettled, and no one is deceived by it.

NOTE.—Since the above opinion was delivered, I have feen the report of a cafe which was tried before lord *Kenyon* in *July*, 1795. It was an action on the cafe for unfkilfully navigating his barge on the river *Thames*, whereby the plaintiff's boat was funk. In opening for the plaintiff, his counfel ftated that after the plaintiff had received the injury, the matter had been referred and an award made. Lord *Kenyon* faid he had ruled before that where parties had agreed to fubmit their differences to any third perfon, and he had undertaken the bufinefs and made an award, the parties fhould be bound by it; and that he who was diffatisfied with the determination, fhould not be allowed to have recourfe to an action; for that after taking his chance of having a determination in his favour he was then too late to recede from his engagement. If, however, there were any circumftances attending the reference to fuch third perfon which would be a fufficient objection, in point of law, to an award, fuch as partiality in the arbitrator, not hearing the party's witneffes, &c. it fhould be open for the parties in fuch cafe to fhew it at the trial.

The defendant failed in proving any circumftance of this fort, or non-acquiefcence to the reference which he alfo attempted to fet up, and the plaintiff obtained a verdict, *Bailey v. Lechmere, Efp. Rep.* 377.

The cafe of the leffee of *Dixon v. Morehead* was tried at a court of Nifi Prius in *May*, 1798, before the Chief Juftice and J. *Smith*, who held the award not binding, and the plaintiff's title regular and fair.

There was a verdict for the plaintiff.